# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ARAB STUDENT UNION OF
JACKSON–REED HIGH SCHOOL,

                Plaintiff,

    v.

DISTRICT OF COLUMBIA, et al.,

                Defendants.

No. 1:24-cv-____

## MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiff Arab Student Union of Jackson-Reed High School (Arab Student Union or ASU) moves for a preliminary injunction ordering the Defendants to allow it and its members to engage in expressive activity at Jackson-Reed High School, including showing a documentary film and posting and distributing printed material.

Plaintiff does not know the identity of Defendants' attorneys and therefore has been unable to request their consent. Plaintiff assumes they will oppose.

## INTRODUCTION

It has been black letter law for more than half a century that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The District of Columbia recognized as much when it promulgated the D.C. Student Bill of Rights, which provides that "[e]ach student shall have the right to exercise his or her constitutional rights of free speech, assembly, and expression without prior restraint, so long as the exercise of these rights does not substantially interfere with the rights of others." 5-E D.C. Mun. Regs. § 2401.17.

Yet the Jackson-Reed High School refuses to allow the exercise of these rights by its Arab Student Union.

Plaintiff Arab Student Union is a recognized student club at Jackson-Reed High School, a public high school in the District of Columbia. For the past four months, the club and its members have been trying to engage in expressive activities at the school—showing a documentary film, putting up posters, distributing literature, presenting a cultural program—but have been stopped at every turn by the school administration. Their activities would not be disruptive; they are the same kinds of activities in which other student clubs engage. Their speech has been suppressed because the school does not want their viewpoint—which concerns the ongoing war in Gaza and its effects on the Palestinian people—to be heard. Plaintiff seeks declaratory and injunctive relief directing the school to stop violating its and its members' First Amendment rights and their rights under the Equal Access Act and the D.C. Student Bill of Rights.[1]

## STATEMENT OF FACTS

Jackson-Reed High School (formerly named Wilson High School), located in Northwest Washington, D.C., educates more than 1,900 students from grades 9 through 12 and focuses on a college-preparatory curriculum. It is one of the most diverse high schools in the country.[2] The Arab Student Union is a recognized student club at Jackson-Reed, with approximately 19 members.[3] It is one of more than sixty school clubs at Jackson-Reed, including the Asian Student

---

[1] Plaintiff brings this suit on its own behalf and on behalf of its members. Complaint ¶ 6. References to Plaintiff's activities also refer to activities by its members.

[2] https://jacksonreedhs.org/wp-content/uploads/2022/11/Student-Planner-SY21-22.pdf. (Note that this online document has not been updated since 2022.)

[3] Declaration of ASU Member, ¶ 3.

Union, the Black Student Union, and the Jewish Student Union.[4] Like many of the other school clubs, it holds regular meetings during lunch hour. Like many of the other clubs, it sometimes holds events of interest to other students and advertises those events within the school. Like many of the other clubs, it sometimes distributes expressive materials on school premises. For example, the Arab Student Union organized a "Pennies for Palestine" fundraiser in January-February 2023 which raised some money for humanitarian aid. It also hosted an event in May 2022, where ASU students handed out Middle Eastern food to other students. In April 2024 the ASU conducted a tabling event at school where students and staff could stop by to get their names written in Arabic.[5]

### 1. The proposed documentary film screening

During the fall of 2023, members of the Arab Student Union became concerned that people did not understand the facts about the Israeli-Palestinian situation and the war in Gaza. In an effort to get people talking about Palestine and bring attention to Gaza, in early December 2023 the ASU decided to show a 49-minute version of the documentary film, *The Occupation of the American Mind*, split between two lunch-hour club meetings on December 14 and 15, 2023.[6] A basic message of the film is that the Israeli government has engaged in a successful but misleading public relations campaign in the U.S. Another important part of the movie is how people are attacked for speaking up about Palestine by labeling them as antisemitic or calling them terrorists, which is something ASU members have to deal with. The film presents a pro-

---

[4] *See* https://jacksonreedhs.org/students/clubs-extracurricular-activies/; Declaration of ASU member, ¶ 2; Declaration of Faculty Sponsor, ¶ 3.

[5] Declaration of ASU Member, ¶ 4; Declaration of Faculty Sponsor, ¶ 5; https://jacksonreedhs.org/students/clubs-extracurricular-activies/.

[6] Declaration of ASU Member, ¶ 6; Declaration of Faculty Sponsor, ¶ 7.

Palestinian point of view and is highly critical of the Israeli government's actions toward Palestinians. The length of the film allowed time for open discussion in each of the two sessions after viewing each half—discussions that the club planned to facilitate. All members of the student body and faculty were welcome to attend and watch the film and participate in the discussion; no one was required to attend.[7]

To advertise the event, members of the Arab Student Union placed posters on some hallway walls in the school about a week before the event, in the same manner as other student clubs have used posters to advertise club events to the school community. The top line of the poster said, "Let's get educated!" Under the title of the film, the poster said, "Join us in learning & discussing!"[8]

Student clubs at Jackson-Reed are routinely allowed to screen films as part of their meetings. For example, the French Club has shown French films and the Marvel Monday Club screens and discusses Marvel films every Monday. There is no special procedure or permission required for a club to show a film at a club meeting, and student clubs at Jackson-Reed are routinely promote their upcoming events with written materials, including posters, without any prior review or approval by school faculty or administrators.[9]

In the late afternoon of December 6, 2023, a parent who was present in the school removed one of the posters from the wall and complained to the school administration about the showing of the film.[10] In response, Principal Sah Brown cancelled the event and had the posters

---

[7] Declaration of ASU Member, ¶ 6.

[8] Declaration of ASU Member, ¶ 8; Declaration of Faculty Sponsor, ¶ 7. A photograph of this poster is attached to the Declaration of ASU Member as Exhibit A. The 49-minute version of the film can be viewed at https://www.youtube.com/watch?v=-jKRwdsq-As&rco=1.

[9] Declaration of ASU Member, ¶¶ 7, 8; Declaration of Faculty Sponsor, ¶¶ 7, 10.

[10] Declaration of Faculty Sponsor, ¶ 8.

taken down. In an email on December 10 to the ASU's faculty sponsor, Principal Brown stated

that he would not allow ASU to screen the documentary, saying that the "content and individuals

associated with the film may provoke strong emotional responses or polarizing views within our

diverse school community." Principal Brown also instructed the faculty sponsor to obtain prior

approval before the club announced any other film screenings. Principal Brown's email said

nothing about any apprehension of disruption or violation of the rights of others.[11]

       In meeting with Principal Brown and others on December 12, 2023, club members sought

permission to show the film. Principal Brown stated that his mind was "set" about not allowing

the ASU to screen *The Occupation of the American Mind.* He explained that he was concerned

that the views portrayed in the documentary may be polarizing and may cause a divide among

the student body. He added that the movie's narrator (Roger Waters) was a problem, and that he

would not feel comfortable associating the school with a person whose views are critical of

people that are part of the school community. He did not express any concern about disruption at

the school if the film were shown. He also informed the ASU that if it wanted to present

materials that were not included on a DCPS-provided list of suggested resources about the Israel-

Palestine conflict, the club had to submit them to Mr. Brown for vetting and approval.[12]

       In a message Principal Brown posted on the school's website, he stated that the film

screening was an "unsanctioned event" and an "unsanctioned activity" and stated that he had

"met with the club's sponsor and the students [and] discussed the proper process for event

approval."[13] However, the event was no less "sanctioned" than many other events, including film

---

[11] Declaration of Faculty Sponsor, ¶¶ 9, 11.

[12] Declaration of ASU Member, ¶ 9; Declaration of Faculty Sponsor, ¶ 12.

[13] Addressing Recent Concerns: A Message from Principal Brown, *available at*
https://jacksonreedhs.org/addressing-recent-concerns-a-message-from-principal-brown/.

showings, that have been held by the Arab Student Union and other student clubs at Jackson-Reed. There is no rule requiring students to obtain permission to screen a film during a club meeting over lunch. Nor is there any "official process" for the approval of posters advertising student club events; clubs routinely advertise their meetings and events in this manner.[14]

On January 3, 2024, after the winter break, the ASU emailed Principal Brown a list of four additional films ASU wanted to screen. The email said, "We want to start our monthly screening with these movies so please get back to us." Mr. Brown did not respond for more than a month. On February 6, he emailed, "These movies are currently under review, and I'll provide you with an update by the end of the week." On February 12, he emailed that the films were still under review. On February 22, he told ASU that he had spoken with a DCPS's "content specialist" and was hoping to get a response the next day. ASU has never heard back from Mr. Brown about whether it is allowed to screen any of the films that it proposed.[15]

Plaintiff has been trying to show *The Occupation of the American Mind* for more than four months and has still not been allowed to do so. Nor has it been allowed to show any of the other films it proposed. Plaintiff wishes to show *The Occupation of the American Mind* while students are still at school this semester. The last day of school for Seniors is Friday, June 7, and ASU wants interested Seniors to be part of its audience, so they can bring a better understanding of this subject with them to college next fall. Members of the club who are Seniors also want to participate in the screening and the discussion.[16]

---

[14] Declaration of Faculty Sponsor, ¶¶ 7, 10.

[15] Declaration of ASU Member, ¶ 10.

[16] Declaration of ASU Member, ¶ 12.

## 2. The proposed Palestinian cultural presentation

Seeking to inform and educate their fellow students about the Palestinian people, the Arab Student Union and its members also decided to present a Palestinian Culture Night at the school in January 2024. Other student clubs have held similar events. For example, in May 2023, the Ethiopian Eritrean Organization hosted a cultural event, which was so successful that they are going to have another one in May 2024. The ASU based its vision for a Palestinian Culture Night on that event.[17]

Because the Culture Night would be a larger event and held after regular school hours, ASU's faculty sponsor submitted an "Internal Building Use Agreement" form on December 19, 2023. The event was promptly approved and was scheduled for January 18, 2024—thirty days later—and was put on Jackson-Reed's official calendar. However, the event was later removed from the calendar. ASU's faculty sponsor was told that the reason for the removal was because the ASU had not planned the event one month in advance, which was not true. Nor is any such requirement reflected in the staff handbook or any other written materials provided by the school. That was the only reason given; no fear of any disruption was expressed. The ASU tried to reschedule the event for February or March with more than one month's notice, but they were not allowed to do so.[18]

Having been denied access to the school forum, Plaintiff's members and others presented a Palestinian cultural program at Busboys and Poets, a restaurant located in Takoma Park, D.C., on January 18, 2024—the same date they had planned to present it at the school. The event was

---

[17] Declaration of ASU Member, ¶ 13.

[18] Declaration of Faculty Sponsor, ¶ 13.

well-attended and successful.[19] However, because the event was off campus, it was attended by only a handful of Jackson-Reed students who were not members of the Arab Student Union. Because students were the audience Plaintiff primarily wished to reach, Plaintiff and its members still wanted to present such an event at Jackson-Reed. But the school refused to allow it in January, February, or March—despite having much more than a month's notice.[20]

Eventually, the school approved a Palestinian Culture Night during Arab Heritage Month in April, and it is now scheduled for April 25, 2024. But ASU was subjected to a review and approval process unlike any its faculty sponsor has experienced in the past or that sponsors of other clubs have ever had to go through, including a detailed review of the proposed program. Although a Palestinian Culture Night is now expected to take place, it has been so heavily censored and restricted that it no longer presents the message that Plaintiff and its members had envisioned for the event.[21]

### 3. The proposed tabling and distribution of printed material

Student clubs at Jackson-Reed regularly engage in "tabling" in the school's atrium during lunch hour. The school provides tables and chairs, and student groups distribute printed and other materials and engage in conversation with other students to promote their clubs and spread awareness about the subject matter of the clubs. The materials distributed at such events are not required to be reviewed or approved in advance by the school. Before this spring, the ASU has not had to seek and obtain prior approval of materials to be displayed or distributed at tabling

---

[19] Declaration of ASU Member, ¶ 15. *See also* Lauren Lumpkin, *Students tried to host a Palestinian culture event. Then a local eatery stepped in*, Washington Post, January 22, 2024, *available at*

https://www.washingtonpost.com/education/2024/01/22/dc-students-palestinian-cultural-event/.

[20] Declaration of ASU Member, ¶ 15; Declaration of Faculty Sponsor, ¶¶ 13, 14.

[21] Declaration of ASU Member, ¶¶ 16, 17; Declaration of Faculty Sponsor, ¶ 14.

events.[22] Students also distribute small items to each other in school on an even more informal basis. For example, some students at Jackson-Reed have recently distributed blue ribbons that other students can wear to express support for Israel. They don't need school permission to do that, and no one has stopped them.[23]

The Arab Student Union planned to have a tabling in early March 2024 to distribute Pro-Palestine stickers, offer face-paint "tattoos," and distribute a one-page "zine" that displayed and explained various Palestinian symbols.[24] Unlike other clubs, and unlike ASU's own prior experience, it was required to submit its proposed zine for review, and Defendants disapproved of some of the contents and required the students to censor their own expression. Specifically, Defendants required Plaintiff to delete an image of a man holding a set of keys accompanied by text explaining that the "Key of Palestine" represents homes that Palestinians lost when they were expelled or fled in 1948, and to which they hope to return. Plaintiff was also required to delete an image of a popular cartoon character named Handala, who is named after the resilient handal plant, and who symbolizes Palestinian resistance. Plaintiff was permitted to distribute its zine only in this censored form.[25] One ASU member brought to the tabling event several different types of stickers to hand out, including stickers showing the Palestine flag, an outline of the country, and one that said "Free Palestine." During the event a school administrator told the students that they were not allowed to distribute the stickers with the outline of Palestine or the

---

[22] Declaration of ASU Member, ¶¶ 19, 20; Declaration of Faculty Sponsor, ¶ 15.

[23] Declaration of ASU Member, ¶ 19.

[24] Declaration of ASU Member, ¶ 20. A zine (derived from the word "magazine") is a small-circulation self-published work of original or appropriated texts and images, usually reproduced by copy machine. *See* https://en.wikipedia.org/wiki/Zine.

[25] Declaration of ASU Member, ¶¶ 19, 20; Declaration of Faculty Sponsor, ¶ 15. *See also* Exhibits B and C to Declaration of ASU Member (Plaintiff's original zine and Plaintiff's censored zine, respectively).

ones that said "Free Palestine." The administrator cited no policy and gave no reason for this censorship.[26]

### 4. The ongoing censorship of Plaintiff's speech

Plaintiff and its members continue to wish to show the 49-minute version of the 2016 documentary film, *The Occupation of the American Mind*, during two lunch periods this semester, leaving time for open discussion after screening each half of the film. Plaintiff continues to wish to conduct tabling and distribute handouts and stickers this semester, with content to be determined by Plaintiff. Time is of the essence to Plaintiff's speech, as the conflict in Gaza is ongoing and Plaintiff's messages are focused on informing and educating their fellow students in a timely way about the plight of the Palestinian people. But Defendants continue to prohibit Plaintiff from doing these things.[27]

### 5. The absence of any basis to fear disruption

There is no reasonable basis to believe that allowing Plaintiff and its members to carry out the expressive activities they wish to conduct would result in any disruption at Jackson-Reed High School. Defendants have never asserted that they anticipate disruption if Plaintiff's desired activities are carried out.[28] In particular, Principal Brown said nothing about disruption in his December 10 email to the club's faculty sponsor informing him that the film would not be shown, or at the December 12 meeting at which he explained why he had cancelled the film, or

---

[26] Declaration of ASU Member, ¶ 20; Declaration of Faculty Sponsor, ¶ 16.

[27] Declaration of ASU Member, ¶¶ 12, 21. Plaintiff also wishes to present a Palestinian Culture Night, with content to be determined by Plaintiff rather than censored by school officials, but there is not time to organize a second one this semester. Declaration of ASU Member, ¶ 18. Accordingly, Plaintiff does not seek preliminary injunctive relief regarding such an event at this time.

[28] Declaration of ASU Member, ¶¶ 9, 14, 16, 20, 24; Declaration of Faculty Sponsor, ¶¶ 11, 12, 13, 16.

in his subsequent posting about the matter on the school's website.[29] Nor did anyone say

anything about disruption when the Palestinian Culture Night was cancelled,[30] or when Plaintiff

was required to censor its zine or stop distributing certain stickers.[31]

      The students at Jackson-Reed live in the nation's capital and are accustomed to hearing,

seeing, and learning about political and social controversies, including the events of the past six

months in and around Gaza. Jackson-Reed is one of the most diverse high schools in the country,

and its students know that their fellow students come from many different backgrounds and hold

differing viewpoints on many issues. They are exposed to differing opinions every day, in

newspapers, on television, and in social media, as well as in conversations with fellow students

and others. None of this has led to disruption.[32]

      Members of the Arab Student Union have shared their opinions and feelings about the

events in Gaza with fellow students and those conversations have been mutually respectful.

Students at Jackson-Reed understand that education does not occur only in the classroom, and

they value the exchange of views with others who do not necessarily share their own views.

Students at Jackson-Reed have, for many years, been presented with information about, and

engaged in conversations about, highly controversial subjects such as presidential politics,

abortion, racial justice, immigration, and others. None of this has led to disruption.[33]

      There has been extensive publicity about the Arab Student Union's efforts to show the

*Occupation* movie and to present a Palestinian cultural event, including in the Jackson-Reed

---

[29] Declaration of ASU Member, ¶¶ 9, 24; Declaration of Faculty Sponsor, ¶¶ 11, 12.

[30] Declaration of ASU Member, ¶ 16; Declaration of Faculty Sponsor, ¶ 13.

[31] Declaration of ASU Member, ¶ 20.

[32] Declaration of ASU Member, ¶¶ 23; Declaration of Faculty Sponsor, ¶¶ 17.

[33] Declaration of ASU Member, ¶ 23.

High School newspaper,[34] on the school's own website,[35] in the Washington Post,[36] and in the Washington Jewish Week.[37] That publicity has led to much discussion and some disagreement among students but has not led to any disruption or threatened disruption at the school.

## LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the Plaintiff "must: (1) establish a likelihood of success on the merits; (2) show irreparable harm in the absence of preliminary relief; (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that an injunction is in the public interest." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (cleaned up).

## ARGUMENT

### I.  Plaintiff is Likely to Succeed on the Merits of its Claims

In December 1965, John and Mary Beth Tinker went to school wearing black armbands to protest the War in Vietnam. They were suspended "until they would come back without their armbands." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969). At that time, the Vietnam War was "the subject of a major controversy"; "[b]oth individuals supporting

---

[34] Simon Holland, Isadora Groves, & Rohini Kieffer, *Arab Student Union attempt to show documentary halted*, The Jackson-Reed Beacon (Jan. 9, 2024), *available at* https://thejackson-reedbeacon.com/22081/news/arab-student-union-attempt-to-show-documentary-halted-by-admin/.

[35] Addressing Recent Concerns: A Message from Principal Brown, *available at* https://jacksonreedhs.org/addressing-recent-concerns-a-message-from-principal-brown/.

[36] Lauren Lumpkin, *Students tried to host a Palestinian culture event. Then a local eatery stepped in*, Washington Post, January 22, 2024, *available at* https://www.washingtonpost.com/education/2024/01/22/dc-students-palestinian-cultural-event/.

[37] Suzanne Pollak, *Amid Teacher Suspensions, Antisemitism Remains an Issue at Local Public Schools*, Washington Jewish Week, January 10, 2024, *available at* https://www.washingtonjewishweek.com/amid-teacher-suspensions-antisemitism-remains-an-issue-at-local-public-schools/.

the war and those opposing it were quite vocal in expressing their views." *Id*. at 510 n.4 (quoting

the district court). Indeed, school officials noted that a former student had been killed in Vietnam

and some of his friends were still in school. *Id*. at 509 n.3. In short, the war in Vietnam

engendered strong opposing feelings, much as the events in Gaza do today.

Nevertheless, the Court held that the Tinkers' expressive activity was constitutionally

protected. This case raises similar issues regarding student expression about a controversial

current issue; the result should be the same.

**A. Plaintiff's proposed activities are protected by the First Amendment**

In *Tinker*, the Court explained that "[s]tudents in school as well as out of school are

'persons' under our Constitution. They are possessed of fundamental rights which the State must

respect." *Id*. at 511. Thus, "[i]n the absence of a specific showing of constitutionally valid

reasons to regulate their speech, students are entitled to freedom of expression of their views."

*Id*.

*Tinker* identified two grounds on which student speech could be regulated: first, if it

"materially disrupts classwork or involves substantial disorder," *id*. at 513; second, if it results in

"invasion of the rights of others." *Id*. The Court was careful to caution that "undifferentiated fear

or apprehension of disturbance is not enough to overcome the right to freedom of expression,"

*id*. at 508. The fact that some students "made hostile remarks" to the Tinkers provided no basis

to restrict their speech. *Id*.

The *Tinker* standard remains the law, as the Supreme Court recently reiterated in

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021). *Mahanoy* repeatedly invokes the *Tinker*

standards, *see id.* at 187, 188, 189, 192, 193; it reaffirms that for a school "'to justify prohibition

of a particular expression of opinion, it must be able to show that its action was caused by

something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Id*. at 193 (quoting *Tinker*, 393 U.S. at 509). In *Mahanoy*, the fact that some students were "upset" by the plaintiff's expression "does not meet *Tinker*'s demanding standard." *Id*. at 192-93.

Lower courts have also made clear that the second ground identified in *Tinker*, "invasion of the rights of others," cannot justify the restriction of student expression simply because it is controversial or offensive to some. Thus, for example, then-Judge Alito explained for the Third Circuit that "it is certainly not enough that the speech is merely offensive to some listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.); *accord Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 328 (2d Cir. 2006) (observing that "*Tinker* would have no real effect" if schools could prohibit speech because it is offensive); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530 (9th Cir. 1992) (holding that the possibility that speech "could be interpreted as insulting [or] disrespectful" is insufficient to limit students' speech). And at least one court has noted that where, as would be the case here, "students are exposed to speech only as a consequence of voluntary choice, the speaker has not invaded the rights of others." *Bowler v. Town of Hudson*, 514 F. Supp. 2d 168, 178 (D. Mass. 2007), *reconsidered in part on other grounds*, 2007 WL 9797643 (D. Mass. Dec. 18, 2007).

The facts in this case compel the conclusion that Plaintiff's activities are protected. Showing a movie in one classroom during lunch hour, which students have the choice to attend or not, will not materially disrupt classwork or cause substantial disorder, and the school has made no such claim. If the message of the film upsets students who voluntarily choose to watch it, that cannot constitute an invasion of their rights, for they have no right to "'avoid the discomfort and unpleasantness that always accompany[ies] an unpopular viewpoint,'" *Mahanoy*, 594 U.S. at 193 (quoting

*Tinker*, 393 U.S. at 509). That principle is especially apt here, where students are completely free to avoid any potential discomfort or unpleasantness by simply eating lunch in the lunchroom.

Defendants' removal of Plaintiff's posters advertising the film is equally indefensible. Posters are routinely used by student clubs at Jackson-Reed to announce their meetings and activities, and these posters had been displayed in school hallways without incident until a parent who was attending a late afternoon event at the school removed one of them from the wall and complained to the school administration about the film.[38] The posters had caused no disruption and had elicited no complaints by students, who have perhaps learned to appreciate freedom of speech more than some of their parents have.

Likewise, there is no factual basis to predict that Plaintiff's tabling activity would cause substantial disruption or invade the rights of others. In fact, Plaintiff was allowed to table and distribute copies of its zine.[39] But the zine Plaintiff was allowed to distribute was censored, prohibiting Plaintiff from sharing images of two symbols of significance to Palestinians (the Key of Palestine and the cartoon character Handala) and explaining their meaning.[40] It cannot credibly be supposed that allowing Plaintiff to distribute the original version of its zine would have caused substantial disruption, nor have Defendants made any such claim. Nor can it credibly be supposed that allowing Plaintiff to distribute the original version of its zine or its stickers—which no student was obliged to pick up—would have somehow invaded the rights of others.

---

[38] *See supra* at 4.

[39] *See supra* at 9-10.

[40] *See supra* at 9.

Defendants' basis for restricting Plaintiff's expressive activity, as expressed in Defendants' communications with Plaintiff's members and its faculty sponsor, appears to be simply that they wish to avoid in-school communication about a sensitive subject on which students have differing views. Under *Tinker* and its progeny, that cannot suffice. To the contrary, "the school itself has an interest in protecting a student's unpopular expression . . . . [S]chools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy*, 594 U.S. at 190.

### B. Plaintiff's proposed activities are protected by the Equal Access Act

Defendants' refusal to allow Plaintiff's expressive activity also violates Plaintiff's and its members' rights under the Equal Access Act, 20 U.S.C. §§ 4071–4074, a federal statute enacted in 1984 precisely to stop public high schools from discriminating against student groups on the basis of the content of their expression. Under the Act, when students who wish to conduct a meeting within a public secondary school's "limited open forum," the school is prohibited from discriminating against the students on the basis of the "religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. §§ 4071(a), (b). Specifically, the Act provides:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). A "limited open forum" exists whenever a public secondary school "grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." § 4071(b). "Meeting" is defined to include "those

activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." § 4072(3). "Noninstructional time" includes lunch hour and similar activity periods, even if they occur during the school day. *See Ceniceros By & Through Risser v. Bd. of Trustees of the San Diego Unified Sch. Dist.*, 106 F.3d 878 (9th Cir. 1997) (lunch time); *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211 (3d Cir. 2003) ("activity period").

"Thus, even if a public secondary school allows only one 'noncurriculum related student group' to meet, the Act's obligations are triggered and the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time." *Bd. of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 236 (1990).

It is indisputable that Jackson-Reed High School operates a "limited open forum" as defined in the Equal Access Act. The school's own webpage lists more than sixty student clubs and shows their various meeting times. In addition to the Arab Student Union, these clubs include the Asian Student Union, the Black Student Union, the Jewish Student Union, the Ethiopian Eritrean Organization, the Gender Sexuality Alliance, the Disability Student Alliance, and the Community Coalition for Change.[41] Their names alone (there are also short descriptions on the website) demonstrate that they involve expression with a variety of viewpoints on a variety of subjects, including matters of racial/ethnic identity, sexual orientation and gender identity, disability accommodation, and international affairs that are controversial. For example, a school club called The Birds & The Bees Sexual Health Club, has distributed condoms on school grounds, along with a flier providing information about their use, about safe and unsafe

---

[41] *See* https://jacksonreedhs.org/students/clubs-extracurricular-activies/.

17

sexual practices, and about sexually transmitted diseases. The school has not interfered with that activity, which was conducted multiple times this year. Another school club, the Gender and Sexuality Alliance, has organized many events, including a Trans Day of Visibility, a Lesbian Visibility Week, a Queer Visibility Fair, a sale of Pride merchandise in the Atrium during Pride month, and a screening of an original video on the history of the Queer rights movement and the Queer Student experience at Jackson-Reed.[42]

The Equal Access Act has been invoked to prevent public high schools from discriminating against groups that may be quite controversial and unpopular in the school's community, such as LGBTQ+ groups, *see, e.g., Carver Middle Sch. Gay-Straight Alliance v. Sch. Bd. of Lake Cnty.,* 249 F. Supp. 3d 1286 (M.D. Fla. 2017); Christian clubs, *see, e.g., Mergens*, *supra;* and political groups, *see Student Coalition for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Directors*, 633 F. Supp. 1040 (E.D. Pa. 1986) (student group wishing to conduct a public anti-nuclear and peace exposition on school grounds).

Defendants' discrimination against the Arab Student Union on the basis of the content of its proposed speech therefore violates the Equal Access Act.

### C. Plaintiff's proposed activities are protected by the D.C. Student Bill of Rights

Defendants' censorship of Plaintiff's expression also violated Plaintiff's and its members' rights under the D.C. Student Bill of Rights.

The District of Columbia Public Schools has adopted a "Student Bill of Rights," which is codified in Title 5-E of the D.C. Municipal Regulations, section 2401. In relevant part, it provides:

---

[42] Declaration of ASU Member, ¶ 22.

§ 2401.17 Each student shall have the right to exercise his or her constitutional rights of free speech, assembly, and expression without prior restraint, so long as the exercise of these rights does not substantially interfere with the rights of others.

§ 2401.18 The exercise of the constitutional rights of free speech, assembly, and expression by students shall include, but is not necessarily limited to, the following: (a) Wearing political buttons, armbands, or other badges of symbolic expression; . . . (e) Preparation and distribution of posters, newspapers, or other printed matter, on or off school grounds, and the reasonable use of the school public address system subject to standards adopted by the student government organization in cooperation with school officials; provided, that such distribution or use shall be limited to reasonable times before, during, and after school hours in order to prevent undue interference with classroom activities and the rights of others[.]

At a minimum, the Student Bill of Rights incorporates students' "constitutional rights of free speech, assembly, and expression." Because Plaintiff has shown a likelihood of success on its constitutional claims, it follows that Plaintiff has also shown a likelihood of success on its claims under the Student Bill of Rights.

Beyond that, the Student Bill of Rights specifically provides that students are entitled to distribute "posters [and] other printed matter, on or off school grounds," and that they are entitled to exercise these rights "without prior restraint, so long as the exercise of these rights does not substantially interfere with the rights of others." § 2401.18(e). Because, as we have already shown, Plaintiff's activities would not substantially interfere with the rights of others, Defendant Brown's actions in taking down Plaintiff's posters and prohibiting Plaintiff's members from distributing their uncensored zine and their stickers violated the explicit command of the Student Bill of Rights.

The D.C. Public Schools' regulations are authorized by statute, *see* D.C. Code § 38-172, and the Student Bill of Rights thus "has the force and effect of law." *Hutchinson v. District of Columbia Ofc. of Employee Appeals,* 710 A.2d 227, 234 (D.C. 1998) ("A regulation has the force and effect of law, much like a statute."). It is therefore "binding upon the Board," *Dankman v.*

*D.C. Bd. of Elections & Ethics*, 443 A.2d 507, 513 (D.C. 1981); indeed, "'[i]t is axiomatic that once an agency commits itself in its regulations to adhering to certain principles or procedures, it cannot violate them.'" *Id*. (quoting *Zotos International, Inc. v. Kennedy*, 460 F. Supp. 268, 275 (D.D.C.1978)). It is "well established that an agency action made in violation of its own regulations cannot be sustained." *Seman v. D.C. Rental Hous. Comm'n*, 552 A.2d 863, 866 (D.C. 1989) (citing *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954)). Therefore, as a matter of adherence to their own regulations as well as the First Amendment, Defendants should not be allowed to subject Plaintiff's activities to the sorts of prior restraints Plaintiff challenges here.

### D.  The Court Has Authority to Issue Injunctive Relief

This Court can issue injunctive relief in this case both under 42 U.S.C. § 1983 and under its inherent equitable power.

#### 1. Plaintiff is entitled to injunctive relief under § 1983 against Defendant Brown in his individual capacity[43]

Defendant Brown, whom Plaintiff has sued for injunctive relief in his individual capacity, Complaint ¶ 8, is the Principal of Jackson-Reed and bears personal responsibility for the constitutional violations at issue; accordingly, this Court can enjoin him personally to cease violating Plaintiff's First Amendment and other rights. Defendant Brown sometimes exercised his authority directly, for example, when he personally cancelled the planned showing of the film

---

[43] Plaintiff does not at this time seek preliminary injunctive relief against the District of Columbia under § 1983. Discovery may show that the violations of Plaintiff's rights were caused by a District of Columbia policy or custom, such as via the decisions of officials having policymaking authority, so that the District itself will be subject to injunctive relief under § 1983. *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29 (2010). Meanwhile, however, preliminary injunctive relief can be issued against the District of Columbia under this Court's equitable power, as explained below.

on December 14 and 15, 2023, and personally ordered the removal of the posters announcing

that event.[44] On other occasions, he delegated his authority to subordinates or sought input from

DCPS headquarters. But the final decisions were his, as a representative of DCPS made clear at a

meeting with the Plaintiff.[45]

Under § 1983, supervisors are personally liable for constitutional torts when they commit

them, and also when they "know about the conduct and facilitate it, approve it, condone it, or

turn a blind eye for fear of what they might see." *Barham v. Ramsey*, 434 F.3d 565, 578 (D.C.

Cir. 2006) (citation and internal quotation marks omitted).

Although injunctive relief is more commonly pursued against official-capacity

defendants because the resulting injunction runs with the office if the officeholder changes, *see*

Fed. R. Civ. Pro. 25(d), individual-capacity injunctive relief is equally available. This conclusion

follows directly from *Ex parte Young*, 209 U.S. 123 (1908), which explained that even where a

government entity is not directly amenable to suit, the entity's responsible official is separately

subject to suit for injunctive relief "in his person," *Id*. at 160. The modern Court has reiterated

that *Ex parte Young* permits "certain suits seeking declaratory and injunctive relief against state

officers *in their individual capacities*." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997)

(emphasis added); *see also Hernandez v. O'Malley*, 98 F.3d 293, 297 (7th Cir. 1996) ("Because

of the individual-capacity claim in the complaint, however, Hernandez can take advantage of *Ex

parte Young,* 209 U.S. 123 (1908), and obtain prospective relief.") (Easterbrook, J.); *accord

Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005); *MCI*

---

[44] *See supra* at 4-5.

[45] Mr. Raymond Hamilton, Director, Office of Teaching and Learning at DCPS, explained, "we're not making decisions on what is shown. That's up to admin." A student asked, "So you mean admin at our school or admin, like central office?" Mr. Hamilton replied, "Admin at the school." Declaration of ASU Member, ¶ 11.

*Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001). The D.C. Circuit has

likewise recognized the availability of injunctive relief against officers in their individual

capacities. In *Vann v. Kempthorne,* 534 F.3d 741 (D.C. Cir. 2008), descendants of freed slaves of

the Cherokee Nation sued the tribe and its chief, seeking injunctive relief against their exclusion

from tribal elections. *See id.* at 745. The plaintiffs sued the chief in his individual capacity,[46] and

the D.C. Circuit held that the suit could proceed against the chief in that capacity, 534 F.3d at

744, squarely rejecting the tribe's objection: "[T]he Cherokee Nation argues that tribal sovereign

immunity bars the suit against its officers because the requested relief really runs against the

tribe itself." 534 F.3d at 750. "This," the D.C. Circuit explained, "is reminiscent of the losing

argument in *Ex parte Young*. . . . The argument is no more persuasive a century later." *Id.*

The fact that Principal Brown acts as a school official in violating Plaintiff's First

Amendment rights is no barrier to individual-capacity relief. In *Hafer v. Melo*, 502 U.S. 21

(1991), the Supreme Court unanimously held that an individual-capacity defendant is subject to

liability for conduct taken as a government official because the actions at issue were taken

"under color" of law within the meaning of § 1983, even if the defendant is named in an

individual capacity. The Court squarely rejected the defendant's argument that an official could

not be liable in an individual capacity for actions taken "within the official's authority"; the

Court explained that "[t]he requirement of action under color of state law means that Hafer may

be liable for discharging respondents precisely because of her authority as auditor general. We

---

[46] *See* Pls.' Second Amended Compl., *Vann v. Norton*, No. 1:03-cv-01711 (D.D.C. Aug. 3, 2006), 2006 WL 4016149, at ¶ 1 ("Plaintiffs bring this action to redress long-standing and invidious racial discrimination against them by the BIA, the CNO and Chadwicke Smith, individually."); *id.* at ¶ 19 ("Plaintiffs also seek declaratory relief under 28 U.S.C. § 1343 against the CNO and against Chadwicke Smith, individually, setting forth their rights …, and a declaration that the CNO and Chadwicke Smith, individually, cannot elect new officials or amend the Cherokee Constitution in an election which denies the Freedmen the right to vote.").

cannot accept the novel proposition that this same official authority insulates Hafer from suit." *Id.* at 27-28. Although *Hafer* was a case about damages, nothing in *Hafer*'s discussion or logic suggests that its invocation of the "under color" principle holds only for damages suits.[47]

Moreover, a doctrine immunizing municipal officials from injunctive relief in their individual capacities would leave plaintiffs entirely without a remedy under § 1983 when municipal officers violate a person's rights in the absence of a municipal "policy or custom" under *Monell*. Concretely: a Metropolitan Police Department "School Resource" (*i.e.,* law enforcement) Officer at Jackson-Reed could boldly declare that he intended to search a student's locker the next day for no reason other than her pro-Palestinian views and Arab ethnicity, and the student could not seek an injunction against that threatened conduct—even though it would clearly violate the First, Fourth, and Fifth Amendments at a single stroke—absent a municipal policy. Likewise, the commander of a police precinct could instruct officers at roll call every morning to issue tickets only to vehicles driven by Black men, and—absent municipal policy— that practice could not be enjoined in a suit under § 1983. That cannot be the law.

---

[47] One case in this district reached a contrary conclusion, *see Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 19-24 (D.D.C. 2007), but it was, respectfully, in error. The basic reasoning of that decision was that a government official can be sued for an injunction only in an official capacity because that is the capacity in which the official acts on behalf of the government. That very reasoning was rejected in *Ex parte Young*, where the state official argued that "the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer." 209 U.S. at 159. The Court responded, "If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct." *Id*. at 159-160 (emphasis added). Likewise, in *Vann v. Kempthorne,* discussed above, the D.C. Circuit permitted an injunctive suit against an individual capacity defendant to proceed the year after *Hatfill*—demonstrating that *Hatfill's* conclusion cannot be correct.

### 2. Plaintiff is also entitled to injunctive relief against both Defendants under the Court's inherent equitable power

Plaintiff has also invoked this court's powers in equity, *see* Complaint ¶¶ 95-99, which provides an independent basis to enjoin both Principal Brown and the District from continuing to violate Plaintiff's legal rights.

As the Supreme Court explained in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), federal courts may use their inherent equitable powers to enjoin violations of federal law by "public officers":

> [W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. *See, e.g., Osborn v. Bank of United States,* 9 Wheat. 738, 838–839, 844; *Ex parte Young, supra,* at 150–151 (citing *Davis v. Gray,* 16 Wall. 203, 220 (1873)). . . . What our cases demonstrate is that, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Carroll v. Safford,* 3 How. 441, 463 (1845).
>
> The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.

575 U.S. at 326–27.[48]

Employing this Court's equitable power to enforce Plaintiff's federal rights here accords with a long tradition of the enforcement of federal rights in equity against municipalities without relying on § 1983. *See, e.g., Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462, 463 (1916) (reversing dismissal of suit "in equity" asserting Fourteenth Amendment claim against Ohio town's regulation of property; the Court never mentioned § 1983); *Vill. of Norwood v. Baker*, 172 U.S. 269, 271, 297 (1898) (affirming injunction declaring that municipal ordinance

---

[48] Although the Court held that the plaintiffs in *Armstrong* could not invoke the federal courts' equitable powers to enjoin an alleged violation of a particular statutory provision, § (30)(A) of the Medicaid Act, that conclusion rested on Congress's "exclusion of private enforcement" of that provision. *Id.* at 328. There is no such congressional exclusion here.

levying an assessment on property violated the Fourteenth Amendment; the Court cited approvingly the principle that "equity may properly interfere to restrain the operation of this unconstitutional exercise of power" (quoting *Cummings v. Merchants' Nat'l Bank*, 101 U.S. 153, 154 (1879)), and never mentioned § 1983.

Indeed, even during the roughly two decades when the Supreme Court adhered to the view that § 1983 could not be used against municipalities at all—from *Monroe v. Pape*, 365 U.S. 167, 191 (1961) (so holding) to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (overruling *Monroe* on this point and permitting § 1983 suits against municipalities)—the Supreme Court continued to recognize federal courts' authority to enjoin unconstitutional actions by municipal actors. For instance, in *Griffin v. County School Board*, 377 U.S. 218, 231 (1964), the Court held that a Virginia county school board had violated equal protection by closing all of its public schools in order to avoid desegregation. The Court emphasized the power of the district court to enjoin the county board of supervisors, school board, and superintendent, among other defendants: "We have no doubt of the power of the court to give this relief to enforce the discontinuance of the county's racially discriminatory practices. It has long been established that actions against a county can be maintained in the United States courts in order to vindicate federally guaranteed rights." *Id*. at 232-33. Unsurprisingly (in light of the 1961 holding in *Monroe* that municipalities were not proper defendants under § 1983), the Court made no mention of § 1983. *See also Wright v. Council of City of Emporia*, 407 U.S. 451, 452 (1972) (upholding, without reference to § 1983, district court's injunction against municipal defendant that attempted to create a new school system to thwart desegregation).

In more recent years, following the Court's clarification in *Armstrong* of the contours of courts' powers in equity, courts of appeals have reconfirmed federal courts' inherent equitable

power to enjoin violations of federal law by municipalities and their agents.  For instance, in *Moore v. Urquhart*, 899 F.3d 1094 (9th Cir. 2018), the plaintiffs, without invoking § 1983, sought to enjoin the sheriff of King County, Washington, from executing eviction orders without court hearings. *Id.* at 1097. The sheriff argued that because plaintiffs failed to state a claim under § 1983, they could not proceed at all, but the Ninth Circuit rejected that argument as "plainly without merit," holding that because plaintiffs sought only equitable relief, not damages, "plaintiffs do not need a statutory cause of action. They can rely on the judge-made cause of action . . . which permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws." *Id*. at 1103 (citing *Armstrong*). Further, the court underscored that the cause of action existed in equity against the sheriff specifically *as a municipal official* (rather than, for instance, a instrumentality of the state): "[I]t is unnecessary for us to resolve the parties' dispute over whether the Sheriff acts on behalf of King County or the State of Washington when he executes writs of restitution," the court explained, because actions in equity "can be brought against *both state and county officials.*" *Id.* at 1103 (emphasis added).

In *Crown Castle Fiber, L.L.C.. v. City of Pasadena*, 76 F.4th 425 (5th Cir. 2023), *cert. denied*, No. 23-698, 2024 WL 674840 (U.S. Feb. 20, 2024), the court held that a plaintiff could invoke the federal courts' equitable power alone to enjoin a city from enforcing land-use standards in a manner the plaintiffs alleged would violate a federal statute. *See* 76 F.3d at 433-34. The equitable power question was squarely presented, the court observed, because the plaintiff "is not seeking a legal remedy through § 1983" but instead "seeks declaratory and injunctive relief, bringing the suit in equity." *Id*. The Fifth Circuit held that such a suit was

permitted under *Armstrong*, "[e]ven though [the statute] does not confer a private right" enforceable via § 1983. *Id.* at 434-35.

By the same token, this Court, when exercising supplemental jurisdiction over the D.C. law claims in this case, has inherent equitable power to enjoin violations of D.C. law. *See, e.g., Am. Univ. in Dubai v. D.C. Educ. Licensure Comm'n*, 930 A.2d 200, 206 (D.C. 2007) (recognizing "complaint for declaratory and injunctive relief to enforce a statutory requirement . . . under the court's general equitable powers"); *Columbia Realty Venture v. D.C. Hous. Rent Comm'n*, 350 A.2d 120, 123 (D.C. 1975) ("[T]he equity power has evolved into an important and essential remedy against administrative abuse."). *See generally Armstrong, supra.*

In sum, even if this Court tentatively concludes that Plaintiff is not entitled to a preliminary injunction against Principal Brown under § 1983 (which it is, and which is Plaintiff's preference), Plaintiff is nonetheless entitled to invoke this Court's inherent equitable power to obtain an injunction against both Principal Brown and the District of Columbia prohibiting the ongoing violations of its First Amendment rights.

## II.      Plaintiff Will Suffer Irreparable Harm in the Absence of Relief

If the Court finds that Plaintiff has shown a likelihood that its constitutional rights are being violated, it follows that Plaintiff is suffering irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022); *Student Press Law Center v. Alexander*, 778 F. Supp. 1227, 1234 (D.D.C. 1991) ("The Court presumes that irreparable harm will flow to plaintiffs from a continuing constitutional violation.").

### III.     The Balance of Equities and the Public Interest Favor the Plaintiff

If the Court finds that Plaintiff has shown a likelihood that its First Amendment rights are being violated, it likewise follows that the balance of equities and the public interest weigh in Plaintiff's favor.

As the D.C. Circuit has held, it is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Accordingly, the Circuit has explained, "the strength of the [defendant's] showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits. The public interest favors the protection of constitutional rights." *Archdiocese of Washington v. WMATA,* 897 F.3d 314, 335 (D.C. Cir. 2018).

Enjoining Defendants to stop censoring Plaintiff's expression may, of course, make some people unhappy, including some students at Jackson-Reed and some parents. But some people's unhappiness about the government's failure to censor other people's speech is not a harm about which the government can legitimately complain: "Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575 (2011). The Supreme Court has explained time and again that "[s]peech may not be banned on the ground that it expresses ideas that offend," *Matal v. Tam*, 582 U.S. 218, 223 (2017), and that "the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Id*. at 246 (plurality opinion) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

For reasons like these, this Court has regularly concluded that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation and citation omitted), and that "[t]he

Government cannot suffer harm from an injunction that merely ends an unlawful practice."

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted).

## CONCLUSION

For the reasons given above, Plaintiff's motion for a preliminary injunction should be

granted. A proposed order is attached.[49]

April 24, 2024                                  Respectfully submitted,

                                                *Arthur B. Spitzer*
                                                Arthur B. Spitzer (D.C. Bar No. 235960)
                                                Scott Michelman (D.C. Bar No. 1006945)
                                                Eleanor DeGarmo[*]
                                                American Civil Liberties Union Foundation
                                                  of the District of Columbia
                                                529 14th Street, NW, Suite 722
                                                Washington, DC 20045
                                                (202) 457-0800
                                                aspitzer@acludc.org
                                                smichelman@acludc.org
                                                edegarmo@acludc.org

                                                *Attorneys for Plaintiff*[**]

---

[49] Because the entry of an injunction will not harm the Defendants, the security required by Fed. R. Civ. P. 65(c) should be set at zero or at a nominal amount. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion as to the amount of security required, if any." (internal quotation marks omitted)); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("the district court did not abuse its discretion in dispensing with the bond").

[*] Eleanor DeGarmo graduated from the Georgetown University Law Center in February 2024 and has been informed that she passed the February 2024 District of Columbia administration of the Uniform Bar Examination. She is awaiting admission to the D.C. Bar.

[**] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this motion.

29